IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **LORENZO BYRD**, on behalf of **TOMMY L. BYRD**, an incompetent adult,<br>    Plaintiff<br><br>vs.<br>**UNITED STATES OF AMERICA**,<br>    Defendant | NO. _____ |

# ORIGINAL COMPLAINT

Plaintiff LORENZO BYRD, on behalf of TOMMY L. BYRD, bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiff complains of the United States and would show the following.

# PARTIES

1.1.    This case arises out of bodily injuries caused by agents and employees of the United States at the Atlanta VA Healthcare Facility in Atlanta, Georgia.

1.2.    Plaintiff is Lorenzo Byrd, on behalf of his father, Tommy L. Byrd, an incompetent adult. Tommy and Lorenzo Byrd reside in Maryland.

1.3.    Defendant is the United States of America.

## JURISDICTION, SERVICE & VENUE

2.1. This Federal District Court has jurisdiction because this action is brought under 28 U.S.C. § 2671–80, commonly known as the Federal Tort Claims Act.

2.2. The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the United States Attorney Byung J. "BJay" Pak, United States Attorney for the Northern District of Georgia by certified mail, return receipt requested at his office:

> The United States Attorney's Office
> ATTN: Civil Process Clerk
> Richard B. Russell Federal Building
> 75 Ted Turner Dr. SW
> Suite 600
> Atlanta, GA 30303-3309

2.3. Service is also affected by serving a copy of the Summons and Complaint on William Barr, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

2.4. Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the United States of America is a defendant and the acts and omissions complained of in this lawsuit occurred in this judicial district.

## AGENCY

3.1.    This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the complaint is made were proximately caused by the negligence, wrongful acts and/or omissions of employees and/or agents of the United States of America working for the Veterans Affairs, while acting within the scope of their office, employment, and/or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual.

3.2.    The United States Department of Veterans Affairs (VA) is an agency of the United States of America.

3.3.    The United States of America, through its agency, the VA, at all times material to this lawsuit, owned, operated, and controlled the Atlanta VA Medical Center, in Atlanta, GA, and staffed it with its agents, servants, or employees.

3.4.    At all times material to this lawsuit, including November 2016, Drs. Craig S. Jabaley, Trygve Dolber, Margaret H. Gorachy, William M. Schultz, Manuel S. Yepes, and David T. Pearce were acting within the course and scope of their employment with the Atlanta VA when providing treatment to Mr. Tommy Byrd.

3.5.    At all times material to this lawsuit, including November 2016, Social Workers Julia Desamours and Julia Nix were employees of the United

States or its agency, and were acting in the course and scope of their employment when interacting with Mr. Byrd and his family.

3.6.    In November 2016, the Atlanta VA provided care and treatment to Mr. Tommy Byrd. Mr. Byrd was a patient of the Atlanta VA and the Atlanta VA and its providers had a doctor-patient relationship with Mr. Byrd.

## JURISDICTIONAL PREREQUISITES

4.1.    Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the Department of Veterans Affairs on August 22, 2017. On May 14, 2020, the VA finally denied via certified mail the administrative claim. Plaintiff filed his lawsuit within six months of the final denial of his claim.

4.2.    Accordingly, Plaintiff has complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.

## FACTS

5.1.    This is a medical malpractice case involving a stroke. A stroke is a life-threatening medical condition that occurs when blood flow to all or part of the brain is obstructed. The obstruction may completely or partially block the blood flow. A stroke may be cardioembolic. That is, a clot created in the left ventricle or atrium of the heart gets pumped to the brain until it reaches a blood vessel too narrow to traverse. Once there, the clot obstructs the flow

of blood. The deprivation of parts of the brain of oxygenated blood manifests in alterations of cognitive or motor function. The longer the obstruction remains, the less oxygenated blood those parts of the brain receive, and the more damage occurs to the brain cells. This damage may take the form of dead brain cells. Too many dead brain cells, and the brain cannot create alternate pathways to recover any lost function. To prevent this cascade of cell death, medical providers must identify the existence and cause of any stroke before providers can intervene with pharmacological or other means. Because a stroke occurs inside the brain, the only way to "see" where and how a stroke occurs is through brain imaging.

5.2. The facts on this case began with a surgery performed by the Atlanta VA. On November 15, 2016, the Atlanta VA performed a lumbar laminectomy with partial medial laminectomy and foraminotomies at the L2-3, L3-4, and L4-5 levels of Mr. Tommy Byrd's spine. Additionally, the VA performed a transforaminal lumbar interbody fusion at L3-4 and posterior spinal fusion at L2-3 and L3-4 spinal levels. The VA performed the procedure under general anesthesia and VA providers noted no complications during the procedure. After the surgery, VA providers extubated Mr. Byrd. They noted that Mr. Byrd could move all four extremities without difficulty.

5.3. VA providers moved Mr. Byrd to the post-anesthesia care unit (PACU). The nurse noted that Mr. Byrd seemed agitated. He was provided 4mg Haldol and 1mg Dilaudid. He had back pain, but otherwise his exam was normal. Providers noted no abnormalities on his labs or blood gases. They also noted that no head imaging was taken upon admission and

concluded that his agitation was most likely due to his post-operative state and having just received anesthesia.

5.4. At 0344 on November 16, 2016, Nurse Tardy noted that Mr. Byrd remained confused and uncooperative. At 0356, she notified the doctor of Mr. Byrd's "continued agitation, also more tachycardia and hypertensive." However, by 0819 that morning, she noted that Mr. Byrd was "awake, calm cooperative. Oriented x3." She found no numbness or tingling, and Mr. Byrd said he was not in pain.

5.5. Later in the morning of November 16, 2016, Dr. Dolber consulted on Mr. Byrd's case. Dr. Dolber recounted Mr. Byrd's history following the surgery. Dr. Dolber's reviewed the patient's charts and realized that his only psychiatric diagnosis was "depression." An examination described Mr. Byrd's behavior as "mildly agitated," but his speech as normal. Mr. Byrd suffered no delusions, but had poor impulse control, cognition, insight, and judgment. Dr. Dolber diagnosed him with hyperactive delirium in the context of the recent surgery, anesthesia, ICU, and the fact that he had multiple medications withheld in preparation for surgery. However, before medicating Mr. Byrd further, Mr. Byrd's girlfriend was able to calm him down and allowed him to fall asleep. Dr. Dolber ordered additional medications but recommended against providing Mr. Byrd "benzos as these can have a paradoxical effect in hyperactive delirium." Dr. Dolber discussed his plan with the staff attending physician, Dr. Kurlyandchik. Several staff physicians acknowledge receipt of this note, including Dr. Nassif, Goracy, and Hochman. However, no neurologic consultation was placed for Mr. Byrd on November 16, 2016.

5.6. Because medical providers should try to rule out life- or limb-threatening causes of a patient's presentation and because the only way to do that is by testing the patient, that same day, the VA also tested Mr. Byrd with an electrocardiograms (ECG). The ECG revealed sinus tachycardia and "probable [left ventricular hypertrophy] with secondary repol abnrm. [*sic*]" This ECG was interpreted as abnormal.

5.7. The next day, on November 17, 2016, at around 0843 in the morning, Mr. Byrd received an orthopedic consult. Dr. Eli Garrard, a fourth-year resident, examined him and found Mr. Byrd "oriented this morning [and] in excellent spirits. Ready to go home. Pain well controlled. No acute events overnight. Denies chest pain, shortness of breath or palpitations." However, Dr. Garrard continued to note the tachycardic presentation.

5.8. On November 18, 2016, Dr. Anuj Patel, a first-year surgical resident, examined Mr. Byrd and found him "not cooperating this am." He was resting in bed, but not following commands. Dr. Patel also noted the "ST" (sinus tachycardia) with a heart rate of 147. He ordered another psychology consult.

5.9. On November 19, 2016 at 0800, the nurses observed Mr. Byrd in bed, resting and cooperative with his care. He told them he did not want breakfast because he was not hungry. He continued to display sinus tachycardia on the bedside monitor. At 1132, an Orthopedic Surgery Note stated that Mr. Byrd felt much better today and wanted to go home. However, he still had sinus tachycardia with a heart rate in the 104-110 range on the bedside cardiac monitor. VA providers still awaited a psych consultation. At 1902

that evening, a nursing note described Mr. Byrd as able to get out of bed and sit in his chair for a short period of time. He continued to have a poor appetite, as he stated he was still not hungry. His heart rate remained in the 105-115 resting range, occasionally rising up to 125-140 beats per minute.

5.10. The next morning, on November 20, at 0742, a nursing observed that while Mr. Byrd remained "alert and oriented x3," he began displaying intermittent confusion and agitation. At noon, Mr. Byrd took part in a physical therapy session, and asked the therapist, "Tell me what I have to do to go home." After the therapy session, the VA therapist concluded that Mr. Byrd showed improvement in ambulation and stability. The medical records showed that Mr. Byrd deeply valued his independence as he "verbaliz[ed] multiple times during the session he wants to go home ASAP."

5.11. At 2315 on November 20th, Nurse Jimmy Robins examined Mr. Byrd and found him in pain, but able to participate in the exam, which revealed no numbness or tingling in his extremities.

5.12. The next morning at 0720, orthopedic surgery noted that Mr. Byrd was doing well and looked forward to discharge. He still had sinus tachycardia with a heartrate of 110-120 on the cardiac monitor. A nursing note at 0805 that day described Mr. Byrd as alert and oriented ×3, in pain, but generally unchanged. Per the doctors' orders, the plan was to discharge Mr. Byrd that day. However, at 0830, the Nurse Okungbowa went to talk to Mr. Byrd but found him confused. The doctors placed his discharge on hold awaiting a consultation with Home Health and social work.

5.13. By 2039 on November 21, 2020, Nurse Itty described Mr. Byrd as alert and oriented to person but disoriented to place and time. Mr. Byrd was restless, anxious, and removing his lines. He was still tachycardic. Nurse Itty described his behavior as "unpredictable." The plan was to continue monitoring Mr. Byrd.

5.14. The next day, November 22, 2020, at around 1100, Nurse Kiflay found Mr. Byrd agitated and yelling, "I've got to get out of here, I've got to get out of here." Nurse Kiflay called a "Code 44" and notified the MD. The nurse medicated Mr. Byrd with Morphine and Haldol, which calmed him down. Nurse Practitioner Holly Lightkep described Mr. Byrd as displaying confusion. Mr. Byrd was unable to tell Nurse Lightkep why he was admitted to the hospital and was disoriented to time. She noted that Mr. Byrd's symptoms are not explained by his chronic psych condition (depression). She notified physicians Goracy, Hochman, and Nassif but no one requested a neurology consult.

5.15. At around 1432, Dr. Boyer, a fifth-year staff psychiatric fellow, saw Mr. Byrd. Dr. Boyer could not get the patient to tell him why the hospital admitted him and noted that Mr. Byrd "displays confusion." Importantly, Mr. Byrd's condition progressed to the point of slurring his words. Mr. Byrd could not follow verbal commands. His thought process was rambling and incoherent. His judgment was impaired. And insight absent. The medical team described Mr. Byrd's change in condition as a "sudden acute mental status change from" being alert and oriented ×3. Yet, Dr. Boyer assessed Mr. Byrd was having "delirium secondary to another general medical condition." Dr.

Boyer did not note in his record what the other "general medical condition" that caused Mr. Byrd's presentation.

5.16.   An ECG taken at 1457 and interpreted as abnormal. It showed sinus tachycardia with "probable LVH with secondary repol abnrm [*sic*]." However, this ECG showed a new indication of "probable left atrial abnormality" not present on the November 16th ECG.

5.17.   Concerned that both slurring of the speech and delirium can be signs or symptoms of a stroke, Dr. Boyer suggested that his superiors at the VA "could consider a neurological evaluation given teams report of sudden acute mental status change from A&Ox3." Dr. Boyer's note and recommendations were read and acknowledged by Dr. Goracy, a VA staff physician at 1600 that same day.

5.18.   At 1623 on November 22, 2016, the VA provided Mr. Boyer a neurology consultation with a second-year neurology resident, Dr. Schultz. The neurologist noted that he could not ascertain a review of systems due to Mr. Byrd's altered mental status. Dr. Schultz noted that the patient was awake and talking but not responding appropriately. Even though Mr. Byrd was slurring his words and had a sudden and acute alteration in cognitive function, Dr. Schultz decided that Mr. Byrd needed no neurologic imaging. Even though Dr. Schultz signed this note that day, his supervising staff physician, Dr. Manuel Yepes, did not see or sign the note until the next day, November 23, 2016 at 1243.

5.19.   The next day, November 23, 2016, at around 1518, Dr. Boyer saw Mr. Byrd again. The patient continued to ramble incoherently. The nurses

told Dr. Boyer that Mr. Byrd "continues to be confused and disoriented." Like the previous day, the mental status exam revealed that Mr. Byrd's thought processes were "rambling, incoherent" and his judgment and insight were impaired.

5.20.   At around 1431, Dr. Schultz, the second-year neurology student, saw Mr. Byrd. He noted that the patient was still disoriented. Importantly, Dr. Schultz noted that Mr. Byrd continued to have "speech deficits that are concerning in the setting of being otherwise alert and awake." He recommended an MRI of Mr. Byrd's brain. Even though Dr. Schultz signed this note at 1437, his supervising staff physician, did not see or sign this note until the next day at 0945.

5.21.   Unfortunately, it was not until November 25, 2016 at 1220 that the VA provided Mr. Byrd with MRI brain imaging. The radiologist concluded that Mr. Byrd suffered an "acute to early subacute subtotal left [middle cerebral artery] infarct [stroke] affecting the territory associated with inferior division branch." The middle cerebral artery provides blood to the areas of the brain responsible for various functions, including speech, primary motor and sensory areas of the face, hand, and arm in the dominant hemisphere. The middle cerebral artery is the artery most often occluded in stroke.

5.22.   VA neurology confirmed this stroke in a note dated the same day at 1333. They noted that the location of the stroke "fits with his receptive > expressive aphasia and subtle right sided weakness." The stroke caused permanent brain-cell death and damage to Mr. Byrd's brain. At that point, providers did not know what caused the stroke although they suspected that the

stroke was cardioembolic in origin. Neurology recommended a complete stroke evaluation, including medical intervention, transthoracic echocardiogram, and telemetry.

5.23.   Following the stroke, the VA's Speech Pathology evaluated Mr. Byrd and found that he had fluent aphasia and poor auditory comprehension. His language deficits were complicated by impaired judgment and reduced participation in the evaluation due to the consequences of his stroke. Throughout his follow up course, Mr. Byrd needed a "1:1 sitter" as a result of his deficits. Mr. Byrd's stroke interferes with normal living, and enjoyment of life, capacity to labor and earn money. The stroke impairs Mr. Byrd's bodily health and vigor and limits the physical activities that he can do. And Mr. Byrd needs constant supervision both in his activities of daily living and for safety and health reasons.

## CAUSES OF ACTION

6.1.   Through its employees, agents, or servants, the Defendant, United States of America, was negligent in one or more of the following respects:

> (a) Negligently failing to timely and properly diagnose stroke in Mr. Byrd;
>
> (b) Negligently failing to timely and properly provide brain imaging for Mr. Byrd;

(c) Negligently failing to timely and properly provide cardiac imaging such as a transthoracic or transesophageal echocardiogram;

(d) Negligently failing to train and supervise staff and students in the care and treatment of patients like Mr. Byrd;

(e) Negligently failing to timely and properly intervene and treat stroke in Mr. Byrd;

(f) Negligently failing to timely and properly care for Mr. Byrd;

(g) Negligently failing to timely and properly evaluate Mr. Byrd;

(h) Negligently failing to timely and properly complete a neurologic workup and consultation in Mr. Byrd;

(i) Negligently failing to timely and properly complete a cardioembolic workup and consultation to identify the source of stroke in Mr. Byrd;

(j) Negligently failed to maintain continuity of care and prevent communications breakdown between its employees;

6.2.    At all times relevant to this lawsuit, the officers, employees, agents, or representatives of the United States were negligent and caused the injuries and damages sustained by the Plaintiff.

## DAMAGES

7.1.    Because of Defendant's negligence, the Plaintiff has suffered, and continue to suffer, severe injuries, including past and future physical and mental pain and suffering; past and future medical, healthcare, and attendant care expenses; permanent disfigurement; past and future permanent physical impairment; loss of enjoyment of life; loss of earnings and earning capacity; and out of pocket expenses and other pecuniary losses. Such injuries are, in reasonable probability, permanent. Plaintiff brings this suit to recover all damages cognizable under the applicable state and federal law resulting from the injuries to them.

7.2.    Because of the negligence of the United States employee healthcare providers, Mr. Tommy L. Byrd sustained damages and injuries including:

      (a) Reasonable and necessary past and future medical expenses;

      (b) Reasonable and necessary attendant, home health, and nursing care expenses;

      (c) Past loss of earnings;

      (d) Future loss of earning capacity;

      (e) Past and future pain and suffering;

      (f) Past and future mental suffering; and

      (g) Past and future injury to Mr. Byrd's peace and happiness.

In addition, Mr. Byrd seeks recovery of all other damages to which he is entitled to under the applicable federal and state laws.

## COMPLIANCE WITH GA ST § 9-11-9.1

8.1.     While Georgia Statute § 9-11-9.1 is a procedural statute inapplicable in a FTCA lawsuit in federal court, out of an abundance of caution, Plaintiff attaches to this complaint an affidavit of merit.

## RELIEF REQUESTED

Plaintiff requests that the United States be cited in terms of law to appear and answer this lawsuit. Upon final trial, Plaintiff seeks judgment against the United States for the amount of actual damages and for such other and different amounts that he shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in the prosecution of this lawsuit; and for such other relief, in law or equity, both general and special, to which the Plaintiff may show himself entitled to and to which the Court believes him deserving.

Respectfully Submitted,

/s/ Nelson O. Tyrone
**NELSON O. TYRONE, III**
nelson@tyronelaw.com
Georgia State Bar # 721189
**TYRONE LAW FIRM**
120 Peachtree Street N.E.

Atlanta GA, 30361
(404) 377-0017 (o)
(404) 249-6764 (f)

/s/ Tom Jacob

**TOM JACOB**, *pro hac vice application forthcoming*
tjacob@nationaltriallaw.com
Texas State Bar #24069981

**JAMAL K. ALSAFFAR**, *pro hac vice application forthcoming*
jalsaffar@nationaltriallaw.com
Texas State Bar #2402719

**STEVEN HASPEL**, *pro hac vice application forthcoming*
shaspel@nationaltriallaw.com
Texas State Bar #24109981

**WHITEHURST, HARKNESS, BREES, CHENG, ALSAFFAR, HIGGINBOTHAM, & JACOB P.L.L.C.**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
(512) 476-4346 (o)
(512) 467-4400 (f)

Attorneys for the Plaintiff