| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

**1. Submit to Appropriate Federal Agency:**

Office of Chief Counsel, VA Regional Office
3322 West End Avenue, Suite 509
Nashville, TN 37203

**2. Name, address of claimant, and claimant's personal representative if any, (See instructions on reverse), Number, Street, City, State and Zip code.**

Lorenzo Byrd, on behalf of Tommy L. Byrd
4606 Waterfall Ct, Apt L, Owings Mills, MD 21117
\*\*\* REPRESENTED BY COUNSEL SEE ATTACHED\*\*\*

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | ▉ 1958 | Single | SEE ATTACHED | SEE ATTACHED |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

SEE ATTACHED CONTINUATION PAGE

*[Stamp: RECEIVED 2017 AUG 22 PM 1:17 OFFICE OF REGIONAL COUNSEL NASHVILLE, TN]*

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

SEE ATTACHED CONTINUATION PAGE

**11. WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| SEE ATTACHED CONTINUATION PAGE | SEE ATTACHED CONTINUATION PAGE |

**12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| | | | $20,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *[signature]* | 512-476-4346 | 8-14-2017 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance?  ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☐ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?  ☐ Yes  ☐ No   | 17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance?  ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  ☐ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A.  Authority: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

   B.  Principal Purpose: The information requested is to be used in evaluating claims.
   C.  Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
   D.  Effect of Failure to Respond: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

**CONTINUATION PAGE**
**CLAIM FOR DAMAGE, INJURY OR DEATH**

**#2  NAME, ADDRESS OF CLAIMANT AND CLAIMANT'S PERSONAL REPRESENTATIVE, IF ANY:**

Claimant's Personal Representatives
Laurie M. Higginbotham (Attorney for Claimant)
Jamal K. Alsaffar (Attorney for Claimant)
Tom Jacob (Attorney for Claimant)
Koby Kirkland (Attorney for Claimant)
Whitehurst, Harkness, Brees, Cheng,
Alsaffar, Higginbotham, & Jacob PLLC
7500 Rialto Blvd., Bldg. 2, Suite 250
Austin, TX 78735

**#6    DATE AND DAY OF ACCIDENT AND #7 TIME:**

This claim concerns the substandard medical care provided by agents and employees of the United States at the Atlanta VA Health Care Facility in Atlanta, Georgia to Tommy Lorenzo Byrd beginning on or about November 15, 2016 and continuing until November 25, 2016 when a MRI and MRA were performed.

**#8    BASIS OF CLAIM:**

This claim concerns the substandard medical care delivered to Tommy Lorenzo Byrd including but not limited to: failure to appreciate findings of a prior psychiatric history, failure to timely and appropriately rule out stroke as a potential cause of "delirium" post operatively, failure to timely order a MRI/MRA for Mr. Byrd, failure to recognize the significance of hyperglycemia and hypertension, failure to timely diagnose and treat an acute stroke occurring during the hospitalization of Mr. Byrd.

On November 15, 2016, Mr. Byrd underwent a lumbar laminectomy with partial medial laminectomy and foraminotomies at L2-3, L3-4 and L4-5. Additionally, he had a transforaminal lumbar interbody fusion at L3-4 and posterior spinal fusion at L2-3 and L3-4. *See Exhibit #1, Surgical Information.*

On the 15th, Dr. Craig S. Jabaley noted he was passing through the ICU when he found Mr. Byrd confused and agitated with nurses attempting to reorient him. A brief exam revealed what Dr. Jabaley thought was "obvious features of hyperactive delirium." Mr. Byrd was not redirectable and noted to be unable to comprehend the need for treatment and bedrest after spinal surgery. Haldol was ordered which rendered Mr. Byrd "comfortable and cooperative" with staff. *See Exhibit #2, Progress Notes.* A prudent health care provider, acting within the standard of care, would not have diagnosed

hyperactive delirium after a "brief exam," but would have either called for a neurology examination, ordered glucose levels, reviewed blood pressure readings and/or ordered a MRI/MRA to rule out stroke as a cause of the "delirium."

Additionally, a psychiatric consult available in Mr. Byrd's medical records at the Atlanta VA from November 7, 2011 included findings of depression, and history of alcohol and marijuana use/abuse in partial remission. There was no mention of any other psychiatric problems. In fact, an examination revealed that his thoughts were "logical and coherent, goal-directed." *See Exhibit #3, Psychiatry Consult.* A prudent provider would have checked his medical records before ruling in delirium without ruling out stroke.

Addendums to the nursing notes on the 16th of November recounted confusion, inability to perform a neurologic examination, tachycardia, and hypertension. These symptoms were reported to the "IOD,"[1] Tele MD and Orthopedist on call. The only intervention was to give Lebetalol for the hypertension. Again, no investigation was done to rule out a stroke as the potential cause of these symptoms. *See Exhibit #4, Progress Notes.* Mr. Byrd's continued agitation and confusion, even while being administered Haldol (an antipsychotic) and Morphine should have clued providers to investigate further.

A psychiatric consult was obtained on November 16th with Dr. Trygve Dolber. The record notes that Mr. Byrd had an "undocumented psych history," but then notes that his remote history only mentions "depression." This sparse history is in stark contrast to the numerous medications he was prescribed. During the interview, Mr. Byrd was restless, oriented X2 and "ignoring" other questions. His significant other of four years was unable to provide any history that would explain his current symptomology. No consideration was given to the notion that Mr. Byrd might have receptive aphasia/expressive aphasia with disorientation and restlessness occurring secondary to stroke. *See Exhibit #5, Progress Notes.*

From November 16th until the 22nd, Mr. Byrd was noted to be oriented X4, anxious, confused, collapsing when attempting to get out of bed with the help of the physical therapist, inconsistent with alertness and involvement as well as erratic with his behavior and movements. *See Exhibit #6, Progress Notes.* By November 22nd, a Code 44 was called as Mr. Byrd was trying to leave prior to completing treatment. He was confused, unable to say why he was admitted, disoriented as to time, and unable to say the year. The psychiatric evaluation performed on the 22nd by Dr. Frederick A. Boyer and Dr. Margaret H. Gorachy recounted the above history, that Mr. Byrd was slurring words, rambling, incoherent with word salad responses and unable to follow commands. Dr. Boyer's impression was that of delirium secondary to some other general medical condition, with flat affect, and unresponsive to internal or external stimuli. Various suggestions were given as to treatment and a statement that "could consider neurologic evaluation given teams report of sudden acute mental status change from alert and oriented X3." *See Exhibit #7, Code 44 and Psychiatry General Progress Note.*

---

[1] IOD likely refers to Intern on Duty, but is unclear from the record.

Neurology evaluation was performed on the 22nd by Drs. William M. Schultz and Manuel S. Yepes. Even though Mr. Byrd was "not responding appropriately, had an altered mental status, oriented X0, followed commands intermittently and they were unable to assess either coordination or gait, the impression was that of toxic/metabolic encephalopathy likely related to polypharmacy and hospitalization. They found no focal deficit to suggest CVA and no risk factors for seizure activity. No neurologic imaging was recommended. *See Exhibit #8, Neurology Consult.*

Social worker Julia Desamours recorded a phone call with Lorenzo Byrd, Mr. Byrd's son, on the 22nd, who told her that his father was not confused or delirious prior to his surgery and was living on his own and able to care for himself independently. *See Exhibit #9, Progress Note.* Julia Nix, Social Worker, talked to Lorenzo Byrd on the 25th, when he arrived at the hospital. Mr. Lorenzo Byrd stated, "My father is not going anywhere until I get some answers as to why he is the way he is. He came into this hospital mentally stable but is now not able to return home on his own." *See Exhibit #10, Progress Notes.*

A MRI/MRA was ordered and completed on November 25th. Results included: acute to early subacute subtotal left MCA infarct affecting the territory associated with inferior division branch, seen with associated findings on MRA, and a background of minimal white matter changes of chronic small vessel ischemia. *See Exhibit #11, Radiology Reports.* Dr. David T. Pearce and Manuel Yepes updated Mr. Lorenzo Byrd with the findings of the MRI/MRA and noted that those findings "fit with his receptive>expressive aphasia and subtle right sided weakness, which was much more apparent after Haldol wore off." Mr. Byrd's providers noted his degree of cognitive impairment was significant and recommended a complete stroke evaluation at this point. *See Exhibit #12, Neurology Progress Notes.*

Instead of assuming that the symptoms Mr. Byrd exhibited post operatively were due to polypharmacy and/or some undiagnosed prior psychiatric disorder, prudent health care providers would have ruled out a stroke as a potential cause. The risks of treatment with intravenous alteplase are not significant nor outweigh the benefits in patients who may have symptoms that mimic those of stroke. Thus, providers should start treatment over delaying to pursue additional studies. In this case, the alternative diagnosis was accepted without even considering the possibility of a stroke. *See Exhibit #13, Scientific Rationale for the Inclusion and Exclusion Criteria for Intravenous Alteplase in Acute Ischemic Stroke: A Statement for Healthcare Professionals from the American Heart Association/American Stroke Association.*

It is well known that timely brain imaging and interpretation remain critical to the rapid evaluation and diagnosis of patients with potential ischemic stroke. Hypertension, and hypoglycemia and/or hyperglycemia are two of the parameters that need appropriate management in the case of ischemic stroke. There are even times when hypertension is allowed in an attempt to increase perfusion to the brain. Even those patients with "minor" stroke symptoms such as gait disturbance and/or aphasia should be treated with fibrinolytic therapy. *See Exhibit #14, Guidelines for the Early Management of*

*Patients with Acute Ischemic Stroke: A Guideline for Healthcare Professionals from the American Heart Association/American Stroke Association*.

U. S. Government health care providers failed to appropriately use information contained in a prior psychiatric evaluation, failed to recognize the potential significance of hyperglycemia and hypertension exhibited by Mr. Byrd post operatively, failed to rule out an acute ischemic stroke as a cause of his symptoms postoperatively, failed to obtain a timely MRI/MRA and failed to timely treat Mr. Byrd for an acute ischemic stroke. The full extent of the damages to Mr. Byrd are not known now, but he now requires 24/7 attendant care, can no longer perform any activities of daily living independently nor return to living alone in his own home.

## #10  STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH WHICH FORMS THE BASIS FOR THE CLAIM:

Because of the negligence of United States employee health care providers, Tommy Lorenzo Byrd, has sustained damages and injuries including, but not limited to:

1. Past and future physical pain, suffering, and mental anguish;
2. Past and future medical and attendant care;
3. Past and future physical disfigurement;
4. Loss of earnings and earning capacity;
5. Past and future physical impairment; and
6. Other general and pecuniary damages.

In addition, Tommy Lorenzo Byrd seeks recovery of all other damages to which he is entitled pursuant to the applicable state and federal law(s).

## #11  WITNESSES

For the identity of witnesses to the incidents described in this claim and persons with knowledge of relevant facts, please refer to the medical and billing records from U.S. Government facilities and health care providers which set forth the identity of health care providers, record custodians, other personnel, and lay persons who are witnesses or potential witnesses in this case. Further, claimants herein are identified as witnesses. Additional witnesses may be known as future discovery is obtained.