**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**LORENZO BYRD**, on behalf of
**TOMMY L. BYRD**, an incompetent adult,

    Plaintiff,

vs.

**UNITED STATES OF AMERICA**,

    Defendant.

**NO. 1:20-CV-03090-LMM**

**DEFENDANT'S RESPONSE TO
PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

    Under Local Rule 56.1(B)(3), Defendant files the following responses and objections to Plaintiff's Additional Facts [Doc. 89].

1. **Prior to Nov. 2016, Tommy Byrd ("Mr. Byrd") had no history of delirium or dementia. Ex. 7, Goracy Dep. 70:8–14.**

    Objection. This statement is not material, and the cited evidence does not support it. Dr. Goracy testified that she did not find any history of delirium or dementia in the medical records she reviewed prior to November 2016. (Goracy Dep. 70:8–14.) Mr. Byrd's MRI/MRA results indicated "background of minimal white matter changes of chronic small vessel ischemia," which brain deterioration could be an early indicator of dementia. (MR 11567.) This citation does not support the statement that Mr. Byrd "had no history of delirium or dementia," only that Dr. Goracy did not see a history noted in the medical records she reviewed at that time.

2. **Tommy Byrd had a routine, elective back surgery on Nov. 15,2016. Ex. 5, Jabaley Dep. 19:7–16.**

   Objection. This citation does not support the statement that it was "routine." Dr.

   Jabaley testified that Mr. Byrd's surgery was an "elective," "not an emergent,"

   surgery.

3. **His surgery ended at 4:12 pm. Ex. 3, at USAO12527.**

   Admit.

4. **And his anesthesia care ended at 4:54 pm. Ex. 3, atUSAO12527.**

   Admit.

5. **The anesthesia care "end time" is when the patient is transferred from surgery to the recovery room. Ex. 5, Jabaley Dep.25:5–10.**

   Admit.

6. **Tommy Byrd did not experience a stroke inter operatively inNov. 2016. ECF No. 67-3, at 2 ¶ 4.**

   Objection. Defendant denies that this citation supports that broad statement. Dr.

   Presciutti testified that "nothing during the surgery gave any indication to me or

   the team, including the anesthesiology team, that Mr. Byrd had experienced a

   stroke intraoperatively." (Presciutti Decl. [Doc. 67-3] at ¶4.)

7. **Approximately two hours after he was transferred to the recovery room (PACU)—on Nov. 15, 2016, at 6:42 pm—Dr. Nichole McIntosh entered a post-operative anesthesia note. Ex. 3, at USAO12526–27.**

   Admit that is when Dr. McIntosh entered her post-operative anesthesia note.

8. **She noted that she was conducting a general assessment of the patient.** *Id.*

   Objection. The cited evidence does not support the statement. The progress note shows a heading for "General Assessment." Dr. McIntosh did not "note that she was conducting a general assessment."

9. **She took his blood pressure, his heart rate, and his oxygen saturation.** *Id.*

   Objection. The cited evidence does not support the statement. The progress note indicates Mr. Byrd's blood pressure, heart rate, and oxygen saturation. It does not indicate that Dr. McIntosh "took" those vitals, or whether a nurse did, or whether Dr. McIntosh got the readings off of the machines that Mr. Byrd may have been hooked to post-operatively.

10. **She noted that his "level of conciseness" was "awake." Mr. Byrd reported to her that he was in minimal pain.** *Id.*

    Admit that Dr. McIntosh noted that Mr. Byrd was "awake." Defendant objects to the extent that this citation does not support Plaintiff's statement that "Mr. Byrd reported to Dr. McIntosh that he was in minimal pain." There is no indication that Mr. Byrd spoke at all during this interaction.

11. **She also determined that he was adequately hydrated, and Mr. Byrd reported to Dr. McIntosh that he was not having any nausea.** *Id.*

    Admit that Dr. McIntosh noted that Mr. Byrd's post-operative hydration was "adequate." Defendant objects to the extent that this citation does not support

3

Plaintiff's statement that "Mr. Byrd reported to Dr. McIntosh that he was not having any nausea." Again, there is no indication that Mr. Byrd spoke at all during this interaction.

12. **She examined his wounds and incision cite for infection andnoted they were clean, dry, and intact.** *Id.*

Objection. This citation does not support that Dr. McIntosh examined a wound or incision. The note indicates that Mr. Byrd's "invasive line site" (intravenous (IV) line for fluids, drains, etc.) was clean, dry, and intact.

13. **She concluded that there was "no apparent postanesthetic complications," and that "Patient has recovered from immediate effects of anesthesia and may be transferred."** *Id.*

Admit.

14. **From the PACU recovery unit, Mr. Byrd is transferred to theintensive care unit. Ex. 5, Jabaley Dep. 23:17–24:1.**

Admit.

15. **Dr. Jabaley "was passing through the ICU" when he "found [Mr. Byrd] confused and agitated with our nurses attemptingto reorient him." Ex. 3, at USAO12526.**

Admit.

16. **Dr. Jabaley sees Mr. Byrd after he had been transferred tothe ICU. Ex. 5, Jabaley Dep. at 29:17–19.**

Admit.

17. **Dr. Jabaley conducted a "brief exam" and concluded that Mr. Byrd had hyperactive delirium. Ex. 3, at USAO12526.**

Admitted that Dr. Jabaley noted that he conducted a "brief exam." Defendant objects to this statement as not supported by the cited evidence because the progress note from Dr. Jabaley does not indicate that Dr. Jabaley "concluded" anything. The progress note states that the exam "revealed obvious features of hyperactive delirium." USAO12526.

18. **Dr. Jabaley put Mr. Byrd on Haldol and Dilaudid, prescription anti-psychotic and pain medications.** *Id.*

Denied as the cited progress note does not support that Dr. Jabaley "put Mr. Byrd on" these drugs, which suggests a continuing prescription. Dr. Jabaley ordered Haldol to address Mr. Byrd's delirium, which he stated did address it "to good effect," and Dilaudid to address his pain, which he also stated addressed it "to good effect." USAO12526.

19. **Mr. Byrd's delirium on Nov. 15, 2016, was acute. Ex. 5, Jabaley Dep. 31:13–16, 32:2–7.**

Admit that Dr. Jabaley described the delirium on Nov. 15, 2016 as "acute," meaning that it was a relatively recent condition and "sounded different than he was like preoperatively," although there was "some report from the ICU nurses vis-à-vis the PACU nurse that he had been agitated in the PACU." (Jabaley Dep. 31:13–24.)

20. **On Nov. 21, 2016, orthopedic surgery input discharge instructions into Mr. Byrd's medical chart. Ex. 3, at USAO12431.**

Admit that the orthopedic surgery team entered a proposed "discharge plan" on November 21, 2016. Further, a note entered at 10:55 am by orthopedic surgery resident, Dr. Patel, stated: "Patient agitated this am as he wants to go home. Has done well with PT but is still pending home health." (USAO 12420.)

21. **These discharge instructions planned to discharge Mr. Byrd home. *Id.***

Objection. The cited evidence does not support the statement. First, "discharge instructions" cannot "plan to discharge" anyone. Defendant admits that the proposed discharge plan entered on Nov. 21, 2016 stated that Mr. Byrd would be discharged home. (*See* USAO 12410-13, 12418, 12420.) Moreover, on November 22, Mr. Minkow stated Mr. Byrd should continue with at-home therapy "when *medically* stable." (USAO 12422 (emphasis added); *see also* USAO 12423 (clearing Mr. Byrd for home therapy "from a PT standpoint" only; USAO 12345 (Nov. 25 PT note also clearing patient for discharge home.) Further, a note entered at 10:55 am by orthopedic surgery resident, Dr. Patel, stated: "Patient agitated this am as he wants to go home. Has done well with PT but is still pending home health." (USAO 12420.)

22. **These discharge instructions planned follow up six weekslater. *Id.***

Objection. The cited evidence does not support the statement. "Discharge instructions" cannot "plan to follow up." Defendant admits that the proposed discharge plan entered on Nov. 21, 2016 stated that Mr. Byrd would need to follow up with the orthopedic surgery team in six weeks.

23. **Before 11:00am on Nov. 22, 2016, both physical therapy and occupational cleared Mr. Byrd for discharge from the hospital. Ex. 3, at USAO12421–23; Ex. 6, Yepes Dep. 60:21–25.**

Objection. The cited evidence does not support the statement. Defendant admits that the progress note entered by the physical therapist staid that Mr. Byrd was cleared "from a PT standpoint" to be discharged, but also noted that he would need continued therapy at home, multiple days per week. Moreover, nothing in the occupational therapist's note indicates "discharging" Mr. Byrd. The occupational therapist indicated Mr. Byrd could not even brush his teeth on his own with receiving verbal cues to assist him. Further, a note entered at 10:55 am by orthopedic surgery resident, Dr. Patel, stated: "Patient agitated this am as he wants to go home. Has done well with PT but is still pending home health." (USAO 12420.) Finally, the cited testimony from Dr. Yepes does not support the statement.

24. **At 11:08am, a VA nurse practitioner called a "CODE 44" where Mr. Byrd was displaying confusion and was disoriented to time, unable to say the year, and answers, "I have no idea" Ex. 3, at USAO12419.**

Admit that a Code 44 was called at or about 11:00 am, but Defendant objects that the cited evidence does not support the statement that the Code 44 was called "due to confusion." Mr. Byrd had experienced confusion since Nov. 15 post-surgery. The Code 44 was called because Mr. Byrd was "trying to leave SICU prior to completing treatment." (USAO 12419.) Defendant admits that Mr. Byrd also displayed confusion and disorientation at that time but that he was able to speak in complete sentences. The same note also indicates that the situation was successfully de-escalated.

25. **At 11:10am, that VA nurse practitioner noted that Mr. Byrd's symptoms are more indicative of altered mental status and are not explained by his chronic psychiatric condition of depression.** *Id.*

Admit.

26. **At around 12:45pm, a psychiatric resident and attending saw Mr. Byrd slurring his words. Ex. 3, at USAO12407; Ex. 7, Goracy Dep. 99:10–13.**

Admit.

27. **At around 12:45pm, Mr. Byrd is asked his name and responds, "Pool dog train is bag going to." Ex. 3, at USAO12407; Ex. 7, Goracy Dep. 91:17–25.**

Admit.

28. **At around 12:45pm, Mr. Byrd is asked "where are we right now?" and responds, "I'm people ton." Ex. 3, at USAO12407; Ex. 7, Goracy Dep. 92:1–8.**

Admit.

29. **At around 12:46pm, Mr. Byrd is asked questions like "What brought you here? What's going on?" and responds, "Know the human." Ex. 3, at USAO12407; Ex.**

**7, Goracy Dep. 92:9–22.**

Admit.

30. **At around 12:45pm, Mr. Byrd was unable to participate in acognitive exam, his judgment was impaired, and his insightwas absent. Ex. 3, at USAO12407–08.**

Admit.

31. **On Nov. 22, 2016, psychiatry assessed Mr. Byrd had: "Delirium secondary to another general medical condition. (Team reports patient was of normal cognition for the past few days,A&Ox3 with plans to discharge today. Team cites that this current mental status is an acute change following being toldthat he would not be going home today and this mental status change to A&Ox0 preceded being given haldol 5 mg IM. We do not feel that the patient's altered mental state is volitional.)" Ex. 3, at USAO12408.**

Admit that Plaintiff has accurately cited the "Assessment" portion of the

psychiatric consult note from Nov. 22, 2016.

32. **Next, a neurology note is entered at 4:23pm, by a second-yearmedicine resident (in a neurology rotation). Ex. 3, at USAO12402–05; Ex. 4, Kumar Dep. 140:6-12; Ex. 8, Jensen Dep. 149:19–150:10. This medicine resident is a trainee.** *Id.*

Objection. Dr. Jensen's cited deposition testimony does not support this

statement, and thus the last sentence should be disregarded. Defendant admits

that neurology resident, Dr. William Schultz, entered the neurology progress

note documenting his encounter with, assessment of, and recommendations

regarding Mr. Byrd—all of which was witnessed by and approved of by the

neurology attending, Dr. Yepes. (Yepes 85:1-9 (supervised Dr. Schultz and would

have had to see patient personally to sign off on note), 86:3-12.)

9

33. **Dr. Yepes, a VA staff neurologist, does not sign the Nov. 22,2016, neurology note until the next day. Ex. 3, at USAO12405.**

   Admit. Dr. Yepes signs the note within twenty-four hours, which is consistent

   with standard VA practice. (Yepes at 86:21-87:8; Strother Decl. at ¶¶4-9 and Exs.

   1 and 2.[1])

34. **Dr. Yepes doesn't remember Mr. Byrd or even the first-year resident who actually performed the exam on Nov. 22, 2016. Ex. 6, Yepes Dep. 84:21–25, 53:22–54:13.**

   Admit.

35. **Dr. Yepes has no independent recollection of Mr. Byrd's medical course. Ex. 6, Yepes Dep. 53:22–24.**

   Admit.

36. **Regarding Mr. Byrd's medical course at the VA in Nov. 2016, Dr. Yepes testified, "I don't remember anything." *Id.* at 54:3–8.**

   Admit.

37. **Identification of the underlying cause is the first step in management of delirium. Ex. 3, at USAO11237.**

   Defendant admits that USAO 11237, a nursing "Protocol for the Management of

---

[1] In response to Defendant's Statement of Material Facts, Plaintiff objected to Mr. Strother's declaration. Mr. Strother is not a witness with personal knowledge except as to the storage of hospital records, including medical records and VA policies. Accordingly, he is a representative of the Atlanta VAMC, akin to a corporate representative that does not need to be separately identified. The policies regarding entering and signing off on medical record notes was not previously produced because it was not a policy requested by Plaintiff in discovery and is only relevant because Plaintiff has questioned Dr. Yepes's testimony regarding his presence at the neurology consults based on the language of the note and when he co-signed it.

the Patient with Delirium," contains a line that states: "F. Identification of underlying causes as the first step in delirium management." Defendant further notes that Dr. Wendy Wright testified that identification of underlying causes is an "important step," but from a ***doctor's*** perspective, one must manage the immediate effects to ensure the patient's and hospital staff's safety and develop a "mitigation strategy" first. (Wright 60:14-61:12.)

38. **Providers should rule out life-threatening causes of a patient's presentation. Ex. 5, Jabaley Dep. 38:8–11; Ex. 6, YepesDep. 32:3–6, 32:17–19 (same); Ex. 7, Goracy Dep. 46:3–6 (same); Ex. 1, Wright Dep. 47:7–14 (same).**

Admit.

39. **Stroke is one of those life- and limb-threatening causes thatshould be ruled out by providers emergently. Ex. 6, Yepes Dep. 44:17–20; Ex. 7, Goracy Dep. 125:2–4; Ex. 1, Wright Dep. 48:12–14, 62:20–22.**

Objection. The cited evidence does not support the statement. Dr. Yepes said a stroke may or may not be a life-threatening condition. (Yepes Dep. 44:17-20.) Dr. Goracy said that if a provider suspects stroke, they should rule out stroke because a stroke *can be* life-threatening. (Goracy Dep. 125:2–4.) Dr. Wright said that doctors should rule out "preventable" or "treatable" life-threatening causes and that a stroke "can be" life-threatening. (Wright Depo. at 48:1-14.) No one testified that a stroke should be ruled out emergently without qualification.

40. **One way to rule out stroke is to get imaging to identify the cause of the**

**patient's presentation.** *E.g.*, **Ex. 8, Jensen Dep.164:12–165:8.**

Objection. The cited evidence does not support the statement. Dr. Jensen was asked whether the purpose of imaging if a stroke is suspected is to rule out whether the stroke is ischemic or hemorrhagic. (Jensen at 164:12-15.) She responded that you are getting an imaging study that may help guide to determine the cause—stroke, tumor, abscess, spontaneous subdural hematoma. (*Id*. at 164:16-165:8.)

41. **Upon suspicion of stroke, Atlanta VA providers were required under VA policies in 2016 to perform an NIH Stroke scale and exclude mimics.** *E.g.*, **Ex. 3, at USAO11285; USAO11265 ¶ f(2).**

Objection. The cited evidence is inadmissible because there is no foundation to establish that this is a protocol that was in effect in November 2016. Plaintiff has no witness testimony to establish as much. Dr. Yepes testified that he was part of the team working on stroke policy at the VA, and this document was not fully implemented at that time. (Yepes 22:1-24:25,Yepes Decl. at ¶¶6-10.)

42. **Any inpatient with signs and symptoms consistent with acute ischemic stroke must be evaluated emergently (within 10 minutes) and the stroke team must be activated. Ex. 3, at USAO11259 ¶ 2; USAO11264 ¶ 3(a).**

Objection. The cited evidence is inadmissible because there is no foundation to establish that this is a protocol that was in effect in November 2016. Plaintiff has no witness testimony to establish as much. Dr. Yepes testified that he was part of

the team working on stroke policy at the VA, and this document was not fully

implemented at that time. (Yepes 22:1-24:25,Yepes Decl. at ¶¶6-10.)

43. **VA providers should have suspected stroke by at least Nov.22, 2016. Ex. 1, Wright Dep. 128:2–13.**

Objection. The cited evidence does not support this statement. Dr. Wright's

testimony begins on p. 126 when counsel asks: Should the Atlanta VA have

suspected stroke before it was noted on the MRI result.? To which she responded

that "she" would have liked to have seen a CT ordered after the "word salad,"

but that she understood, in light of the ongoing, fluctuating symptoms if the

doctors viewed that as a continuation of the delirium, then they would not

necessarily have ordered one. Moreover, the neurology consult did not detect

any aphasia. (*Id*. at 126:25-127:23.) Dr. Wright was also talking about a specific

time that afternoon of Nov. 22, 2016, which is unclear from Plaintiff's statement.

44. **In response, the standard of care required at minimum thatthe VA call a stroke code and get a head CT—neither of which happened. *Id*. at 106:3–15, 130:10–131:1.**

Objection. The cited evidence does not support this vague statement—it is

unclear what actions Plaintiff is claiming should have occurred in response to

what event. Dr. Wright stated that, upon the identification of possible stroke

symptoms, what ***she*** does in ***her*** hospital, is to call a stroke alert. (Wright at 106:3-

13.) Asked again on p. 130 whether the VA violated a standard of care, Dr. Wright

testified that *she* would like to think that she would have ordered at a CT scan,

and that the VA medical providers "should have ordered the CT scan *if they*

*thought this was an acute ischemic stroke*, which I don't have any record of them

doing. If they thought this was just a continuation of his delirium, I understand

why they wouldn't have ordered the CT scan." (*Id*. at 130:10-22 (emphasis

added).) She also states, "there's no need for an urgent CT scan if this stroke is a

couple hours old." (*Id*. at 131:5-6.)

45. **Between Nov. 15 and before Nov. 25, 2016, the Atlanta VA medical providers took no imaging of Tommy Byrd's brain. *See* ECF No. 67-8, at 54–267 (contain portions of Mr. Byrd's medical record).**

Admit.

46. **Between Nov. 15 and before Nov. 25, 2016, the Atlanta VA medical providers did not perform a NIH Stroke Scale exam or provide a score for Tommy Byrd. Ex. 2, Nogueira Dep. 102:16–21; Ex. 6, Yepes Dep. 94:14–19.**

Objection. The cited evidence does not support this statement. The referenced

citations show that the medical records do not show a documented NIHSS score

or note that one was performed.

47. **Ex. 9, at NTL17789–NTL17796 is a true and correct copy of the NIH Stroke Scale. Ex. 1 Wright Dep. 83:22–25; Wright Dep. Ex. 4.**

Defendant admits that this is a copy of a version of an NIH Stroke Scale form.

48. **Between Nov. 15 and before Nov. 25, 2016, the Atlanta VA providers failed to**

**document any "last known well" time as described in the Joint Commission definition of Time Last Known Well. Ex. 3, at USAO146212; *see also* ECF No. 67-8, at 54–267 (contain portions of Mr. Byrd's medical record).**

Defendant admits that, after diagnosing Mr. Byrd's stroke, the Atlanta VA providers did not document a specific time that he was last known to be well, although the medical records showing his daily fluctuating delirium symptoms since Nov. 15, 2016 speak for themselves.

49. **At no time while Mr. Byrd was at the Atlanta VA before Nov. 25, 2016, did Atlanta VA providers document a (a) "time of onset of symptoms,"; (b) the time the stroke team was activated; (c) the time when a member of the acute response team answered the call. Ex. 3, at USAO11259, ECF No. 67-8, at 54–267.**

Objection. The cited evidence does not support this statement. Defendants admit that, ***prior to diagnosing Mr. Byrd's stroke***, the Atlanta VA providers did not document a time of onset of symptoms or a time of activation of and response by a "stroke team."

50. **At no time while Mr. Byrd was at the Atlanta VA before Nov. 25, 2016, did Government medical providers activate the stroke response team. *Id.***

Objection. The cited evidence does not support this statement. Defendants admit that, ***prior to diagnosing Mr. Byrd's stroke***, the Atlanta VA providers did not activate a stroke response team.

51. **By Nov. 23, 2016, no provider had ruled out stroke as a potential cause of Mr. Byrd's presentation. Ex. 7, Goracy Dep. 113:7–11.**

Objection. The cited evidence does not support this statement. Dr. Goracy's

statement was that, based on her review of the medical records, *she* was unaware

of whether any medical provider had ruled out stroke as a potential cause of Mr.

Byrd's presentation.

52. **Mr. Byrd did not receive any treatment for stroke between Nov. 15, 2016, and Nov. 25, 2016. ECF No. 67-1, at 22 ¶ 127; Ex. 2, Nogueira Dep. 100:22–101:5.**

Admitted Mr. Byrd did not receive treatment specifically for stroke prior to the

diagnosis of a stroke.

53. **In 2016, the VA implemented a system for emergent response to strokes by paging an operator. Ex. 5, Jabaley Dep. 34:1–7.**

Objection. The cited evidence does not support this statement.

54. **In 2016, the VA also had implemented the emergency stroke activation system and a pathway for emergent neuroimaging. *Id.* at 34:8–12.**

Objection. The cited evidence does not support this statement. Defendant admits

that Dr. Jabaley stated that, in 2016, the VA had a system for responding to acute

strokes and for getting emergency neuroimaging.

55. **In 2016, if a provider suspected stroke, they were supposed to activate the stroke team emergently. *Id.* at 35:17–21, 36:2–11; *see also* Ex. 3, at USAO11258 (stroke response team includes neurology and imaging team).**

Admitted to the extent the statement is consistent with Dr. Jabaley's testimony.

Defendant objects to the cited document, USAO 11258, which was testified to be

part of a protocol that was not fully implemented in November 2016. (Yepes 22:1-

24:25,Yepes Decl. at ¶¶6-10.)

56. **The phone number listed in the VA's ischemic stroke policy (404-686-8334) for Emory transfers was an accurate number for Emory transfers.** *Compare* **Ex. 3, at USAO11264 ¶ (2)(a)(1)** *with* **Ex. 1, Wright 170:20–171:12 ("I'm seeing the accurate phone number."), Wright Dep. Ex. 6 (showing the same phone number as found in the VA's 2016 policy).**

Admit.

57. **The VA did not provide Mr. Byrd any head imaging untilNov. 25, 2016, at 12:20pm. Ex. 3, at USAO11566–67.**

Admit.

58. **The imaging taken on Nov. 25, 2016, of Mr. Byrd's head identifies a stroke that occurred while Mr. Byrd was hospitalized at the VA.** *Id.*

Admit.

59. **Mr. Byrd's stroke was in the middle cerebral artery inferior division resulting in Wernicke's aphasia. Ex. 3, at USAO52, USAO11567; USAO3367; USAO145788–89.** *See also* **Ex. 9, atNTL1839–40; NTL1946–47; NTL2106–08.**

Admit.

60. **Mr. Byrd's aphasia is severe. Ex. 4, Kumar Dep. 136:5–7.**

Defendant admits that Dr. Kumar makes this characterization, but it is wholly

inconsistent with Mr. Byrd's speech pathologist's diagnosis as set forth in the

medical records, and that is the only information from which Dr. Kumar is basing

his opinion because he did not evaluate Mr. Byrd. Mr. Byrd's speech pathologist

identified his aphasia as moderate. (Def's Reply Brief, Ex. 2, USAO 2340-43.)

61. **The carotid artery branches into the middle cerebral artery. Ex. 2, Nogueira Dep. Ex. 3, at 1–2.**

Admit.

62. **A stroke blocking the inferior division of the middle cerebral artery causes Wernicke's aphasia. Ex. 4, Kumar Dep. 60:18–61:3.**

Objection. The cited evidence does not support this statement. Dr. Kumar's testimony was not that such strokes cause Wernicke's aphasia. His testimony was that such strokes (i.e., blocking the inferior division of the MCA), without significant motor deficits, were difficult to discern from delirium.

63. **A stroke of the "inferior division of the middle cerebral artery, leading to a Wernicke's aphasia" is one of the known medical causes of agitated delirium. Ex. 9, at NTL6873.**

Objection. The cited evidence does not support this statement. This article states that "Posterior cerebral artery strokes can result in an agitated delirium." *An M2 occlusion is not a posterior cerebral artery stroke.* (Jensen at 211:7-212:13.)

64. **M2 strokes can cause death or moderate to severe disability in approximately 50% of patients. Ex. 9, at NTL17702.**

Objection. This statement is not supported by anything in Exhibit 9. Nor is there an "NTL17702" in Exhibit 9. Moreover, the cited article is inadmissible hearsay. Moreover, it is irrelevant and should not be admissible because it is a 2019 article being used by Plaintiff to establish what should have been done or what should have been known in 2016.

65. **Mr. Byrd's stroke occurred in the "proximal M2 cutoff." Ex. 3, at USAO12344.**

Admitted to the extent that the "proximal M2 cutoff" still qualifies this stroke as

an M2.

66. **Specifically, the clot that blocks blood flow sits at right where the MCA M1 branches into the inferior division of the M2—on the MRI/MRA you can see the stump of the M2, which is the beginning of the vessel. Ex. 2, Nogueira Dep. 124:6–13.**

Admits.

67. **Devices were approved for thrombectomy by the FDA since at least 2004. Ex. 3, at USAO14387, 89.**

Admit.

68. **The FDA put no limitation on which arteries these approved devices may be used in.** *Id.*

Objection. The cited evidence does not support this statement. The cited reference

does not speak to FDA limitations on the use of approved devices at all and thus

cannot be cited as support for the statement that there were no limitation.

69. **Emory University Hospital is situated no more than three miles away from the Atlanta VA. Ex. 9, at NTL6831.**

Objection. The cited evidence is inadmissible hearsay and lacks foundation.

70. **Since 2004 at least, Emory University Hospital accepted transfer patients from the Atlanta VA, including stroke patients. Ex. 1, Wright Dep. 27:8–20, 32:14–22.**

Admit that Emory University Hospital has accepted patients transferring from

the Atlanta VAMC, including stroke patients. Defendant does not admit that VA

stroke patients with an M2 occlusion were being transferred to Emory for

thrombectomies in 2016. (Nogueira 147:23-148:8.)

71. **Grady Hospital sits less than 8 miles away from the Atlanta VA. Ex. 9, at NTL6832.**

Objection. The cited evidence is inadmissible hearsay and lacks foundation.

72. **Both Emory University Hospital and Grady Hospital were comprehensive stroke centers in 2016. Ex. 1, Wright Dep. 26:7–21.**

Admit. Defendant does not admit that, in 2016, Emory was performing

thrombectomies on patients with M2 occlusions and clinical profiles similar to

Mr. Byrd's. (Nogueira 147:23-148:8.)

73. **Both Emory University Hospital and Grady Hospital could perform thrombectomies on patients in 2016. Ex. 1, Wright Dep. 34:2–7, 37:6–12; Ex. 2, Nogueira Dep. 136:9–20.**

Admit. Defendant does not admit that, in 2016, Emory was performing

thrombectomies on patients with M2 occlusions and clinical profiles similar to

Mr. Byrd's. (Nogueira 147:23-148:8.)

74. **To be eligible to be a comprehensive stroke center, a hospital must have performed mechanical thrombectomy and post-procedure care for at least 15 patients with ischemic stroke over 12 months. Joint Commission Stroke Certification Program Comparison, available at https://www.jointcommission.org/-/media/tjc/documents/accred-and-cert/certification/certification-by-setting/stroke/dsc-stroke-grid-comparison-chart-42021.pdf (last visited Sep. 25, 2021).**

Admit to the extent that this does not designate that comprehensive stroke

centers have performed any M2 thrombectomies or other procedures outside of

the strongest recommendations under the AHA/ASA Guidelines.

75. **Similarly, they must have the capability of performing CT, MRI, labs, CTA, MRA, catheter angiography 24/7; other cranial and carotid duplex ultrasound, TEE, TTE as indicated.** *Id.* **at 2.**

   Admit.

76. **After diagnosis of stroke on November 25, the VA kept Mr.Byrd in the hospital until December 19, 2016. Ex. 3, at USAO11657.**

   Admit that Mr. Byrd stayed at the Atlanta VAMC until he could find a bed at a

   suitable rehab facility. (Ex. 1, MR 12275-78, -94-6.)

77. **On December 19, 2016, Mr. Byrd was transferred to PruittHealth Brookhaven and he was discharged from Pruittin March 18, 2017. Ex. 9, at NTL5128.**

   Admit.

Respectfully submitted,

KURT R. ERSKINE
   *Acting United States Attorney*

/s/ Trishanda L. Treadwell
Trishanda L. Treadwell
*Assistant United States Attorney*
Georgia Bar No. 356896
trish.treadwell@usdoj.gov
75 Ted Turner Drive SW, Ste. 600
Atlanta, GA 30303
(404) 581-6000   Fax (404) 581-6181

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing

motion and brief have been prepared using Book Antiqua, 13-point font.

/s/ Trishanda L. Treadwell
_____
Trishanda L. Treadwell
*Assistant United States Attorney*

## Certificate of Service

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Tom Jacob
**TOM JACOB**, *pro hac vice*
tjacob@nationaltriallaw.com
Texas State Bar #24069981
**STEVEN HASPEL**, *pro hac vice*
shaspel@nationaltriallaw.com
Texas State Bar #24109981
**WHITEHURST, HARKNESS, BREES, CHENG, ALSAFFAR, HIGGINBOTHAM, & JACOB P.L.L.C.**
7500 Rialto Blvd, Bldg. Two, Ste 250 Austin, TX 78735
(512) 476-4346 (o)
(512) 467-4400 (f)

**NELSON O. TYRONE, III**
nelson@tyronelaw.com
Georgia State Bar #721189
**TYRONE LAW FIRM**
1201 Peachtree Street N.E.
Atlanta GA, 30361
(404) 377-0017 (o)
(404) 249-6764 (f)
Attorneys for the Plaintiff

October 20, 2021.

/s/ Trishanda L. Treadwell
_____
Trishanda L. Treadwell
*Assistant United States Attorney*