## IN THE UNITED STATES DISTRICT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**LORENZO BYRD,** on behalf of
**TOMMY BYRD,** an incompetent adult,

Plaintiff

vs.

**UNITED STATES OF AMERICA,**

Defendant

**NO. 1:20-CV-03090-LMM**

### GUARDIAN AD LITEM RECOMMENDATION TO SETTLE

### ON BEHALF OF TOMMY BYRD

Lauren A. Bryant was appointed by this Court as Guardian Ad Litem for

Tommy Byrd, an incompetent adult, and hereby files this recommendation that the

Court approve the settlement on his behalf, and shows this Court the following:

### SUMMARY OF THE CASE

1.  This lawsuit is a medical malpractice case involving Tommy Byrd ("Mr.

    Byrd"), arising from a stroke he suffered in November 2016 after a surgical

    procedure performed on his spine. At the time, Mr. Byrd was fifty-eight

    (58) years old. Mr. Byrd underwent surgery at the Atlanta Veterans Affairs

1

Medical Center ("Atlanta VA) on that date for a lumbar laminectomy with partial medial laminectomy and foraminotomies at the L2-3, L3-4, and L4-5 levels of his spine. Additionally, the Atlanta VA performed a transforaminal lumbar interbody fusion at L3-4 and a posterior spinal fusion at L2-3 and L3-4 spinal levels. Mr. Byrd was under general anesthesia for the procedure and there were no noted complications during the procedure.

2.  After the procedure, Atlanta VA providers extubated Mr. Byrd and noted he could move all four extremities without difficulty. Atlanta VA providers moved Mr. Byrd to the post-anesthesia care unit ("PACU"), where a nurse noted he was agitated so he was provided 4mg Haldol and 1mg Dilaudid. Mr. Byrd reported back pain but otherwise his exam was normal. Atlanta VA providers noted no abnormalities in his labs or blood gases, and they also noted that no head imaging was taken upon admission and concluded his agitation was most likely due to his post-operative state and his exposure to anesthesia for the procedure.

3.  Over the next week, Mr. Byrd's condition ranged from alert and oriented x3, to confused. Mr. Byrd was anxious to go home, but he remained in sinus tachycardia and had little appetite. Various nurses and doctors noted Mr.

Byrd's condition and although he was scheduled for discharge on November 21, 2016, he ultimately remained in the hospital due to continued confusion, rambling thoughts, tachycardia, and intermittent delusional thought. Despite these concerns and the delay of his discharge, Mr. Byrd received no neurological consultation until November 22, 2016, after a fifth-year psychiatry fellow noted several signs and symptoms consistent with a stroke.

4.  On November 22, 2016, Mr. Byrd received a neurology consultation with a second-year neurology resident, who could not ascertain a review of symptoms due to Mr. Byrd's altered mental status-even though he was awake and talking, Mr. Byrd's responses were inappropriate. And even though his words were slurred, and he had sudden and acute alteration in cognitive function, the doctor decided Mr. Byrd needed no neurologic imaging. The next day, Mr. Byrd continued to ramble incoherently, and the nurses advised the psychiatry fellow that he continued to be confused and disoriented.

5.  The next day, the second-year neurology resident recommended an MRI for Mr. Byrd's brain, given his continued speech and cognition deficits, but the MRI did not happen until November 25, 2016, where it was ultimately

concluded that Mr. Byrd had suffered a stroke. (USAO_BYRD_012382–84). The stroke caused permanent brain damage and brain-cell death to Mr. Byrd's brain, and evaluations of Mr. Byrd show he now has resulting fluent aphasia and poor auditory comprehension, with language deficits complicated by impaired judgment.

6. The Atlanta VA discharged Mr. Byrd on December 19, 2016, after occupational therapy recommended continued treatment for cognition, activities of daily living (ADL's), and "IADL" (independent activities of daily living) retraining. Mr. Byrd continued with treatment in rehabilitation at Pruitt Health and by March 13, 2017, he was reported as making good progress, and was independently eating, dressing, ambulating, toileting, bed mobility and transfers. Pruitt Health released Mr. Byrd on March 18, 2017.

7. Mr. Byrd moved to Baltimore, Maryland, to be close to his son, Lorenzo Byrd, where he received additional treatment at the Baltimore VA Medical Center. Mr. Byrd and his son were frustrated with Mr. Byrd's limitations post-stroke, and he began to experience frequent episodes of loss of consciousness/seizures and Lorenzo Byrd felt it safer for his father to be placed into a group home or other supervised living situation; Mr. Byrd ultimately moved in with his brother, William Byrd, for additional support.

Mr. Byrd received speech therapy throughout 2019 and reported difficulties understanding what people were trying to tell him, which made him feel depressed. Mr. Byrd attended some physical therapy in 2020, and even received an intravenous lidocaine infusion for post-stroke pain and post-laminectomy syndrome.

8.  According to medical records, despite continued back pain, Mr. Byrd is considered a poor candidate for revision surgery given the postoperative stroke suffered after his November 2016 surgery. Mr. Byrd requires the use of an assistive device (cane) to walk, and his gait is unbalanced.

9.  Mr. Byrd's stroke has interfered with, and will continue to interfere with, his activities of daily living, and he needs constant supervision in his activities of daily living, for his own health and safety.

10. Mr. Byrd's adult son, Lorenzo Byrd, filed suit on behalf of his father and against the United States on the basis that the VA negligently failed to timely and properly diagnose the stroke, to provide proper brain imaging for him, to evaluate and care for him, and for failing to supervise and train staff and students to care and treat patients like Mr. Byrd.

11. Lorenzo Byrd is not Mr. Byrd's court-appointed legal guardian or conservator, however this Court determined Lorenzo Byrd is a proper

"next best friend" and has standing to pursue the case on Mr. Byrd's behalf. <u>See</u> Order, dated July 19, 2021.

12. A January 2021 life plan and cost analysis ("Life Care Plan") prepared for the Plaintiff explained Mr. Byrd will need continued and regular treatment by a physiatric physician specialist or neurologist for the rest of his life. Given the stroke contributed to an accelerated cognitive decline in Mr. Byrd, he will also likely need lifelong medications and treatment to mitigate his worsening cognitive abilities. Mr. Byrd had a history of depression before the stroke, which has worsened as a result, likely contributing to his aphasia and cognitive deficits. An in-home support person is recommended to help reduce the strain upon Mr. Byrd and his family caregivers. Mr. Byrd should receive routine diagnostic imaging and laboratory studies, physical and occupational therapies, medications, and assistive devices. Mr. Byrd will likely need long-term nursing or residential care, if not constant in-home nursing support. The projected expense for his future medical and support needs is significant.

13. Mr. Byrd's severe brain injuries caused by the stroke will continue to cause physical impairment, permanent disfigurement, loss of earnings and earning capacity, and likely significant future medical expenses. At more than five

(5) years post-stroke, Mr. Byrd continues to suffer aphasia and severely impaired comprehension. Mr. Byrd will continue to need constant care and supervision for the remainder of his life. As of January 2022, Mr. Byrd cannot live independently and resides with his brother in Maryland, and near his son, Lorenzo, and the family provides significant support, supervision, and companionship to Mr. Byrd each day.

14. Mr. Byrd needs, and will continue to need, constant care. He will not be able to be completely independent and do things on his own for the remainder of his life.

15. Mr. Byrd is under age sixty-five.

## SETTLEMENT AND DISBURSEMENT

16. Plaintiff Lorenzo Byrd, on behalf of Mr. Byrd, settled his case for $1,500,000.00, subject to the Court's approval. Plaintiff Lorenzo Byrd is Mr. Byrd's son. The net proceeds after attorney's fees, liens, and expenses of litigation, will be distributed to a 42 U.S.C. § 1396p(d)(4)(A) special needs trust for the benefit of Mr. Byrd. The net to Mr. Byrd's special needs trust after fees and costs will be: **$1,006,621.77.** The breakdown is as follows:

Total Settlement: $1,500,000.00

Attorney's Fees: $375,000.00 (25%)

Litigation Costs: $118,378.23 (which may increase slightly)

Medicaid: $0.00 (which may change if Mr. Byrd

utilizes Medicaid before this matter concludes)

Special Needs Trust Deposit: **$1,006,621.77**

### ANALYSIS

17. I spoke with Mr. Byrd via Zoom, who was with his brother William Byrd. I found Mr. Byrd, who was able to communicate verbally and acknowledged an understanding of our conversation, to be polite, well-groomed, and able to recall my name briefly after our introduction. However, Mr. Byrd also seemed to be generally confused and not fully able to comprehend the substance of this matter, or my involvement in this case on his behalf. Mr. Byrd did express his frustration about his condition, could understand his son and brother help him, could recall that a lawsuit was filed, and seemed to understand that a settlement was imminent. Mr. Byrd also expressed gratitude that the settlement would provide him with resources needed to provide for his care into the future. However, beyond those broad subjects, Mr. Byrd did not seem to comprehend the specifics of

a settlement, the importance of a special needs trust, or that his funds would not be available to him on demand.

18. I also spoke with Lorenzo Byrd, who does understand the finality of this settlement for his father, and that the use of a special needs trust was necessary to protect Mr. Byrd's eligibility for needs-based benefits as he continues to age. Lorenzo Byrd, as next best friend of his father, Mr. Byrd, fully understands he is not required to settle any of Mr. Byrd's claims, and that he could proceed to trial. Lorenzo Byrd understands the Court might award his father more money than he is settling for, but he also understands the risks associated with going to trial and that such a trial might result in less money, or no money at all. Lorenzo Byrd understands that by entering this settlement, he is waiving Mr. Byrd's right to a trial, and that neither he, nor his father, can ever come back against this Defendant for more money or relief for anything resulting from this incident once this Court approves the settlement. Lorenzo Byrd understands the finality of his decision to settle, agrees the settlement is appropriate, and in his father's best interests. Lorenzo Byrd also agrees that a distribution to a special needs trust for Mr. Byrd's benefit is appropriate and necessary.

19. Trial in this matter poses a risk for Plaintiff, as the additional fees and

expenses associated with a case taken to trial can often overwhelm or negate a substantial gain, which even if successful at trial, might result in a net recover to Mr. Byrd of less than the pending settlement. For Mr. Byrd to net something equal to the current settlement proposal, a verdict would need to be significantly and appreciably higher than the settlement to reach the same result for Mr. Byrd to account for the additional fees and costs associated with a trial. Lorenzo Byrd, and Mr. Byrd, both want the case closed.

20. The use of a special needs trust for Mr. Byrd is imperative, given his likely extensive and expensive ongoing medical needs. In speaking with Lorenzo Byrd, it appears Mr. Byrd is already approved for Medicaid; however, he also receives some medical benefits from the Veterans Administration and has yet to request or require coverage from Medicaid. To the extent Mr. Byrd receives or will receive needs-based benefits in the future, the receipt of funds into his name, into a conservatorship, or even into a revocable or irrevocable trust for his benefit, would disqualify him from such needs-based benefits. A special needs trust, and specifically a supplemental care special needs trust established pursuant to 42 U.S.C. § 1396p(d)(4)(A), is appropriate and necessary to protect Mr. Byrd's eligibility for those needs-based benefits with income and asset limitations.

21. Mr. Byrd is under age 65 and disabled, therefore he is eligible to create and fund a special needs trust in accordance with 42 U.S.C. § 1396p(d)(4)(A) (or is able to benefit from the creation of a special needs trust established pursuant to court order). Mr. Byrd's 2021 Life Care Plan outlines numerous projected health care and medical needs, including additional surgeries, diagnostic procedures, equipment, therapies, counseling, in-home providers, medications, and possible long-term nursing or other residential care. Similarly, the Life Care Plan identifies an average residual life expectancy for a non-Hispanic Black male, between the ages 62 and 63, living in the United States, to be eighteen (18) years. The Life Care Plan estimates Mr. Byrd's cost of care over his anticipated remaining (now approximately seventeen (17)) years to be in the millions of dollars.

22. Mr. Byrd is presently without any significant source of income (Lorenzo and William Byrd advised he receives approximately $1,100 per month from a VA pension) and has no assets of any great value. This means the proceeds available from this settlement are likely the only funds Mr. Byrd will ever have to provide for his care and needs for the remainder of his life. With his anticipated residual life expectancy, and the plethora of anticipated and recommended expensive medical needs, even this settlement of more

than a million dollars would not be enough to pay for his care for the remainder of his life, let alone the next several years. Were Mr. Byrd to receive these funds outside of the protections afforded by a 42 U.S.C. § 1396p(d)(4)(A) trust, he would no longer be eligible for those needs-based benefits which can cover most, if not all, of the anticipated medical treatments he will likely require. And without access to those needs-based benefits, Mr. Byrd would surely deplete his resources in short order, or perhaps choose to forego expensive medical procedures that could increase his quality of life if he deemed the cost excessive. Numerous are the stories of individuals foregoing a treatment or medication because it the cost is prohibitive. Maintaining access to coverage provided by the VA, Medicaid, or other needs-based programs, ensures Mr. Byrd can continue to receive quality treatment and services without probable immediate (or near immediate) depletion of his limited assets. Additional tangential benefits also often come from utilizing 42 U.S.C. § 1396p(d)(4)(A) trusts. For example, using this trust will ensure that Mr. Byrd's funds are protected from others who may try to take advantage of a man with limited (and declining) mental abilities, will mitigate any need to establish a conservatorship (because the funds are already protected and in the control

of a trustee, a conservator may never need to be appointed for Mr. Byrd), and will expedite the distribution of assets at Mr. Byrd's death because, after Medicaid, etc., is reimbursed from the remaining balance, the funds can be distributed directly by the trustee to Mr. Byrd's heirs or beneficiaries.

23. Utilizing a 42 U.S.C. § 1396p(d)(4)(A) trust is, for Mr. Byrd, critical. Preserving his eligibility for needs-based benefits is crucial, given the likelihood his ongoing care needs will be extensive and expensive and his funds limited. The use of a 42 U.S.C. § 1396p(d)(4)(A) trust will afford Mr. Byrd the ability to continue to receive appropriate medical treatment, while ensuring his funds are protected for his supplemental care needs.

24. The settlement is appropriate. The attorney's fees and expenses are both reasonable. *See* 28 U.S.C. § 2678.

25. Based on the foregoing, I believe the proposed settlement is in the best interests of Mr. Byrd. Further, I believe that the proposed settlement breakdown is fair and that the use of a 42 U.S.C. § 1396p(d)(4)(A) special needs trust for the benefit of Mr. Byrd to be imperative and appropriate. I would respectfully request that this Honorable Court enter a Final Judgment approving the proposed settlement and breakdown, including the attorney's fees, case expenses and the use of a special needs trust for Mr. Byrd.

## REVIEW

26. In analyzing the settlement in light of the best interests of Mr. Tommy Byrd, I performed the following:

    a. Reviewed the pleadings in the matter;

    b. Reviewed the medical history of Mr. Byrd;

    c. Reviewed the Plaintiff expert reports;

    d. Reviewed of life care plan for Mr. Byrd;

    e. Had several conversations with counsel for Plaintiff;

    f. Reviewed the Government expert reports;

    g. Reviewed the proposed disbursement proposal;

    h. Had an online Zoom interview with Lorenzo Byrd, Mr. Byrd and William Byrd (Mr. Byrd's brother);

    i. Drafted this Report; and

    j. Will attend any Final Hearing(s) on the matter as the Court deems necessary.

    k. If the Court should hold any in-person hearing, it is my recommendation that the family should not be required to attend or attend via tele-conference or other remote technology.

    Mr. Byrd lives out of state now and travel a risk for him given the

ongoing Covid-19 pandemic; I believe it to be in the best interest of Mr. Byrd to avoid travel for any final hearing.

### GUARDIAN AD LITEM FEE & EXPENSE

27. My fee to date totals $3,000.00 (for 10 hours of time at my reduced GAL rate of $300/hour, reduced from 14.5 hours, in reviewing records, interviewing parties and counsel, and preparing this Recommendation) and my expenses total $0.00. I hereby request a Guardian Ad Litem fee of $3,000.00 payable by Plaintiffs.

Respectfully Submitted:

By: /s/ Lauren A. Bryant
Lauren A. Bryant
Guardian Ad Litem for Tommy Byrd
State of Georgia Bar No. 418111
The Law Office of Lauren A. Bryant, LLC
11138 State Bridge Rd., #150
Alpharetta, Georgia 30022
(470)466-2615
lauren@laurenabryantlaw.com

## CERTIFICATE OF SERVICE

By my signature above, I certify that a copy of this pleading, Plaintiffs' Motion, has been sent to the following on February 2, 2022, via the Court's CM/ECF notice system.

> Kurt R. Erskine
> ACTING U.S. ATTORNEY
> TRISHANDA L. TREADWELL
> ASSISTANT U.S. ATTORNEY
> Georgia Bar No. 356896
> trish.treadwell@usdoj.gov
> 600 Richard B. Russell Federal Bldg.
> 75 Ted Turner Drive, S.W.
> Atlanta, Georgia 30303
> (404) 581-6000
> (404) 581-6150 facsimile
>
> **TOM JACOB**, *pro hac vice*
> tjacob@nationaltriallaw.com
> Texas State Bar #24069981
> **STEVEN HASPEL**, *pro hac vice*
> shaspel@nationaltriallaw.com
> Texas State Bar #24109981
> **Whitehurst, Harkness, Brees,**
> **Cheng, Alsaffar, Higginbotham,**
> **& Jacob P.L.L.C.**
> 7500 Rialto Blvd, Bldg. Two, Ste 250
> Austin, TX 78735
> (512) 476-4346 (o)
> (512) 467-4400 (f)
>
> **NELSON O. TYRONE, III**
> nelson@tyronelaw.com
> Georgia State Bar #721189
> **TYRONE LAW FIRM**
> 1201 Peachtree Street N.E.
> Atlanta GA, 30361
> (404) 377-0017 (o)
> (404) 249-6764 (f)
>
> Attorneys for the Plaintiff